The STATE OF NEW YORK, The City of New York and The New York City Health and Hospitals Corporation, Plaintiffs,

v.

Otis R. BOWEN, or his successor, Secretary of the United States Department of Health and Human Services, Defendant.

Dr. Irving RUST, on behalf of himself, his patients, and all others similarly situated; Dr. Melvin Padawer, on behalf of himself, his patients, and all others similarly situated; Medical and Health Research Association of New York City, Inc., individually and on behalf of its delegate agency Planned Parenthood of New York City, Inc.; Planned Parenthood of Westchester/Rockland; and Health Services of Hudson County, New Jersey, Plaintiffs,

v.

Otis R. BOWEN, or his successor, Secretary of the United States Department of Health and Human Services, Defendant.

Nos. 88 Civ. 0701 (LLS), 88 Civ. 0702 (LLS).

United States District Court, S.D. New York.

June 30, 1988.

Robert Abrams, Atty. Gen., of the State of N.Y., Suzanne M. Lynn, Asst. Atty. Gen., Chief, Civil Rights Bureau, Marla Tepper, Sanford M. Cohen, Asst. Attys. Gen., New York City, for plaintiff The State of N.Y.

Peter Zimroth, Corp. Counsel, Lorna Bade Goodman, Asst. Corp. Counsel, Chief, Affirmative Litigation Div., Hillary Weisman, Asst. Corp. Counsel, New York City, for plaintiffs The City of New York and The City of New York Health and Hospitals Corp.

American Civil Liberties Union Foundation, Janet Benshoof, Rachael Pine, New York Civil Liberties Union, Norman Siegel, Hollyer, Jones, Brady, Smith, Troxell, Barrett & Chira, New York City (Laurie Rockett, of counsel), for plaintiffs Dr. Irving Rust, et al.

Department of Justice, Civil Div., Richard K. Willard, Asst. Atty. Gen., Robert J. Cynkar, Deputy Asst. Atty. Gen., Thomas Millet, Thomas Bovard, Susan Rudy, Office of Gen. Counsel, Dept. of Health and Human Services, Washington, D.C. (Joel Mangel, Carol Conrad, of counsel), for defendant Otis Bowen, M.D., Secretary of Health and Human Services.

## OPINION AND ORDER

STANTON, District Judge.

Plaintiffs challenge final regulations promulgated on February 2, 1988 by the Department of Health and Human Services, which prohibit Title X projects [1] from

---

**1.** In 1970 Congress enacted the Family Planning Services and Population Research Act of 1970, Pub.L. No. 91–572, 84 Stat. 1506 (codified at 42 U.S.C. §§ 300–300a–8 (1982)). The Family Planning Services and Population Research Act is the popular name for Subchapter VIII of the

counseling or referring clients for abortion as a method of family planning, require Title X grantees to separate their projects, physically and financially, from any abortion activities, and prohibit Title X projects from encouraging, promoting or advocating abortion as a method of family planning. At a hearing on February 19, 1988 defendant was enjoined from enforcing the regulations with respect to these plaintiffs until further order. Both sides [2] have moved for summary judgment pursuant to Fed.R.Civ. P. 56.

There is no dispute about any of the facts material to the disposition of these motions.

## BACKGROUND

### I. The Parties

Plaintiff State of New York ("State") is a grantee of Title X funds through the New York State Department of Health ("NYSDOH"). In 1987–88, NYSDOH distributed nearly $6 million in Title X grants to 37 agencies. Plaintiff City of New York ("City"), through its Department of Health, provides technical and consultative services to Title X grantees in New York City. It brings suit on behalf of itself and the people of the City. Plaintiff New York City Health and Hospitals Corporation ("NYCHHC"), a public benefit corporation, is a principal provider of hospital services to the low income population of the City.

Plaintiff Dr. Irving Rust, an obstetrician and gynecologist, is the Medical Director of the Bronx Center, a facility of plaintiff Planned Parenthood of New York City, Inc. ("PPNYC"), and plaintiff Dr. Melvin Padawer is the Medical Director of plaintiff Planned Parenthood of Westchester/Rockland ("PPWR"). As such, each supervises a Title X funded health care program.

PPNYC, a not-for-profit corporation, is the single largest provider of family planning services in the City, serving over 31,000 persons per year. PPNYC's Bronx Center, its only Title X–funded facility, receives a $439,391 Title X grant, amounting to 50% of its family planning budget. PPWR, composed of two not-for-profit corporations, operates seven clinics which provide a broad array of reproductive health care services throughout Westchester and Rockland counties. PPWR receives $325,000 from NYSDOH under Title X, which is 23% of its family planning budget. Plaintiff Health Services of Hudson County, New Jersey ("Hudson Health"), a provider of family planning, maternal and infant care, pregnancy testing, options counseling, and abortion services, receives a Title X grant of $148,674, which is 33% of its family planning budget. PPNYC, PPWR, and Hudson Health all sue on their own behalf, as well as for their staffs and patients. Although all three perform abortions at one or more of their locations, none uses Title X funds for that purpose.

Plaintiff Medical Health and Research Association of New York ("MHRA"), a not-for-profit organization, has received Title X grants since 1982. Its 1987 grant amounted to $2,104,950. MHRA, in turn, subgrants Title X funds to other organizations, including PPNYC. It also retains some Title X funds for its own service division, the Maternity, Infant Care—Family Planning Projects ("MIC–FPP"). MHRA sues on behalf of itself, MIC–FPP, and its patients.

Defendant Otis R. Bowen is the Secretary of the United States Department of Health and Human Services ("HHS") ("the Secretary"), and is authorized to make Title X grants "in accordance with such regula-

Public Health and Welfare laws (which appear at Title 42 of the United States Code), and is commonly called Title X (referring to its designation as Title X of Chapter 373 of Public Law No. 91–572).

The new regulations provide that " 'Title X program' and 'Title X project' are used interchangeably and mean the identified program which is approved by the Secretary for support under section 1001 of the Act ..." 53 Fed.Reg.

2922, 2944 (Feb. 2, 1988) (to be codified at 42 C.F.R. § 59.2). In this opinion the term "Title X grantee" is also used for the same purpose.

**2.** Motions to submit *amicus curiae* briefs on the Secretary's behalf by Senator Gordon J. Humphrey and Congressman Thomas J. Tauke, et al. and the American Academy of Medical Ethics, et al., and on plaintiffs' behalf by the American Medical Association, are granted.

tions as the Secretary may promulgate." 42 U.S.C. § 300a–4(a) (1982).

## II. The Statute and Regulations

In enacting Title X, Congress sought "to make comprehensive, voluntary family planning services, and information relating thereto, readily available to all persons ..." 116 Cong.Rec. 24094 (1970). Section 1008 of Title X provides:

> None of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning. 42 U.S.C. § 300a–6 (1982).

The challenged regulations, appearing at 53 Fed.Reg. 2922 *et seq.* (Feb. 2, 1988) (to be codified at 42 C.F.R. §§ 59.2, 59.8, 59.9, 59.10) control the use of funds for family planning services and set specific standards for compliance with Title X.

In plaintiffs' view sections 59.2, 59.8, 59.9, and 59.10 frustrate Congressional intent, and violate Title X clients' First and Fifth Amendment rights and Title X health providers' First Amendment rights.

Section 59.2 adds new definitions. It defines "family planning" as

> the process of establishing objectives for the number and spacing of one's children and selecting the means by which those objectives may be achieved ... including contraceptive methods ... and the management of infertility ..., preconceptional counseling, education, and general reproductive health care.... Family planning does not include pregnancy care (including obstetric or prenatal care).[3]

As required by section 1008 of the Act, abortion may not be included as a method of family planning in the Title X project.

Section 59.2 also defines "project funds" to include "all funds allocated to the Title X program, including but not limited to grant funds, grant-related income or matching funds."

Section 59.8 ("the counseling and referral prohibition") sets forth the role of the Title X program after a woman is diagnosed as pregnant. To remain eligible for Title X grants, a project may not provide counseling or referral for abortion as a method of family planning. § 59.8(a)(1) Title X projects must refer every pregnant client for "appropriate prenatal and/or social services", furnish her with a "list of available providers that promote the welfare of mother and unborn child", and provide her "with information necessary to protect the health of the mother and unborn child until such time as the referral appointment is kept." § 59.8(a)(2). The list may not be used indirectly to encourage or promote abortion, such as by weighing the list in favor of health care providers who provide abortions: it may not include providers whose "principal business is the provision of abortions," exclude providers who do not provide abortions, or "steer" clients to providers who offer abortion as a method of family planning. § 59.8(a)(3) Information "medically necessary to assess the risks and benefits of different methods of contraception" may be provided, but again counseling about or promoting abortion as a method of family planning is prohibited. § 59.8(a)(4) Example 6 under section 59.8(b)(4), however, does allow a client to be provided with "information contained in the [oral contraceptive] package insert ..., referring to abortion only in the context of a discussion of the relative safety of various contraceptive methods and in no way promoting abortion as a method of family planning."

Section 59.9 (the "separation requirement") requires the physical and financial separation of Title X projects from activities proscribed by section 1008 of Title X and sections 59.8 and 59.10. Satisfaction of the criterion, "objective integrity and independence from prohibited activity," will

---

**3.** The separation between family planning (which occurs exclusively before pregnancy) on the one hand, and pregnancy, pre-natal and obstetric care (which naturally occur after conception) on the other, is a significant concept in the new regulations. It underlies the Secre-

tary's views that abortion counseling has no function in family planning (abortion is irrelevant until after "planning" has failed), and that Title X programs deal with family planning, not pregnancy services or counseling for which they merely supply a list of references.

be determined by the Secretary on a case-by-case basis. Relevant factors include separate accounting records, facilities, personnel, signs, and other forms of identification. § 59.9(a)–(d)

Under section 59.10 a Title X project may not "encourage, promote, or advocate abortion as a method of family planning." § 59.10(a) Specifically prohibited activities include lobbying in support of pro-abortion legislation, providing pro-abortion speakers, paying dues to any group which advocates abortion, "using legal action" to make abortion available, and developing and disseminating materials advocating abortion. § 59.10(a)(1)–(5)

## III. Questions Presented

Plaintiffs contend that these regulations violate the intent and letter of Title X. Further, they argue that sections 59.8 and 59.10 are viewpoint discriminatory, censor speech and impair a woman's fundamental right to informed reproductive choice, in violation of the First and Fifth Amendments.

The Secretary contends that these regulations implement "the Congressional command that no federal funds supporting Title X family planning projects be used to advance abortion as a method of family planning," (Defendant's Memorandum in Support of Summary Judgment, p. 3) ("Defendant's Memorandum") and do not place unduly burdensome restrictions on protected rights. (*Id.* at 49)

In resolving these legal contentions, the court is not to consider the morality or wisdom of the regulations, nor to substitute its views for either the enactments of the legislature or the regulations of the Secretary. Those issues are grave and fervently debated, and convictions regarding them are conflicting and deeply held, and they should be settled at the polls where each voice can count. The court's duty in this case is narrow: to determine whether the regulations exceed or contravene the Secretary's authority under Title X and, if not, whether they infringe rights protected by the Constitution. Unlike the other two district courts which have reviewed the regulations [4], I conclude that they do not.

## DISCUSSION

### I. Congressional Intent

The court's first inquiry is whether the regulations sufficiently accord with the intent of Congress.

#### A. *Statutory Language*

■ "The starting point for reviewing an agency's construction of a statute is the language of the statute." *Securities Industry Association v. Board of Governors of the Federal Reserve System,* 839 F.2d 47, 52 (2d Cir.1988). As the Court stated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 843 n. 11, 104 S.Ct. 2778, 2781, 2782 n. 11, 81 L.Ed.2d 694 (1984):

"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, ... the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."

At issue here is section 1008 of Title X which provides:

None of the funds appropriated under this subchapter shall be used in pro-

4. The United States District Court for the District of Colorado preliminarily enjoined the Secretary from enforcing the regulations on February 18, 1988, *see Planned Parenthood Federation of America, et al. v. Bowen,* 680 F.Supp. 1465 (D.Colo.1988), and entered a permanent injunction on June 15, 1988. The United States District Court for the District of Massachusetts entered a permanent injunction against enforcement of the regulations in *Commonwealth of Massachusetts, et al. v. Bowen,* 679 F.Supp. 137 (D.Mass.1988), *appeal pending,* 1st Cir. No. 88–1279. Both courts issued thoughtful opinions on questions presented by these cases.

grams where abortion is a method of family planning.

Standing alone, that statutory language does not specifically control the questions addressed by the regulations: Can clients be referred to or counseled about abortion services? To what degree must facilities which perform abortions or abortion-related services be separated from those eligible to receive Title X grants? May grantees of Title X funds use funds from other sources to engage in activities restricted by the regulations? Therefore the appropriate query is whether the new regulations are "based on a permissible construction" of Title X.

In making such a determination, the court looks to section 1008's legislative history, as well as Congress's and HHS's interpretations of section 1008 since its enactment. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 110–20, 100 S.Ct. 2051, 2057–62, 64 L.Ed.2d 766 (1980).

### B. *Legislative History*

Congress's enactment of Title X was not without lengthy testimony, detailed reports, and significant floor debate. The provisions of Title X which generated such discussion, however, almost exclusively concerned Congress's twin goals of making family planning services affordable and not coercing anyone to restrict the size of her family. Few comments addressed the matters now before the court, and those do not elaborate on Congress's intent regarding counseling and referral, or encouraging, promoting, and advocating abortion.

Plaintiffs argue that the Secretary's limitation on family planning services (i.e., that Title X's provision of services terminates upon pregnancy) contravenes congressional contemplation that "comprehensive" and

"continuing" family planning services would be available for women of lower incomes, pointing to the Senate Report:

> The committee does not view family planning as merely a euphemism for birth control. It is properly a part of comprehensive health care and should consist of much more than the dispensation of contraceptive devices.... [A] successful family planning program must contain .. medical services, including consultative examination, prescription, and continuing supervision, supplies, instruction, and referral to other medical services as needed. S.Rep. No. 1004, 91st Cong., 2d Sess., *reprinted in* 116 Cong.Rec. 24,094 (1970).

Although members of Congress vehemently declared that Title X funds would not support abortions [5], apparently none stated that Title X services would be limited to women who were not pregnant.

Plaintiffs also argue that HHS's separation requirement and definition of "project funds" diverge from Congress's vision that Title X programs would work hand-in-hand with state and local family planning services:

> It is, and has been, the intent of both Houses that the funds authorized under this legislation be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make clear this intent. The legislation does not and is not intended to interfere with or limit programs conducted in accordance with State or local laws and regulations which are supported by funds other than those authorized under this legislation. Conf. Rep. No. 91–1667, 91st

---

**5.** "[T]his legislation does not provide for abortions, contrary to some of the rumors apparently circulating concerning it" (116 Cong. Rec. 37367, remarks of Rep. Nelson); "I strongly support ... the provision in the House version of this legislation that prevents this bill from being construed as support for abortion." (116 Cong.Rec. 37371, remarks of Rep. Pickle); Congress "wisely prohibited the use of any Federal funds in the bill from being used for abortion." (116 Cong. Rec. 37375, remarks of Rep. Broyhill); "With the 'prohibition of abortion' amendment—title X, section 1008—the committee members clearly intend that abortion is not to be encouraged or promoted in any way through this legislation." (116 Cong.Rec. 37375, remarks of Rep. Dingell).

Cong., 2d Sess. 8–9 (1970), U.S.Code Cong. & Admin.News 1970, pp. 5068, 5081, 5082.

They argue that the final sentence quoted above would allow grantees who receive support in addition to Title X funds (as all grantees must) to provide abortion-related services approved under local laws. That appears a permissible, although not a necessary, interpretation.

■ On balance, if these are discrepancies they do not appear of sufficient weight (when contrasted with the direct statutory language) to compel the conclusion that the regulations are beyond the Secretary's broad authority. Only when Congress's intent is clear and certain can the regulations be enjoined on the basis of legislative history alone:

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. (footnotes omitted)

*Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782.

C. *Subsequent Legislation and Legislative Interpretations*

■ Plaintiffs assert that since 1970 "Congress has retained the original language of section 1008" (Plaintiff Rust's Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, p. 19) ("Rust Memorandum") and "consistently defeated amendments meant to accomplish what the new regulations impose." (Plaintiff State's Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, p. 35) They say "amendments to Title X seeking to prohibit counseling, referral, or what has been called promotion or encouragement of abortion, have been introduced and rejected *seven* times." (Plaintiff Rust's Reply to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, p. 6) (emphasis in original).

Whereas "subsequent legislation declaring the intent of an earlier statute is entitled to significant weight," *National Labor Relations Board v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974), this court is also mindful that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," *Consumer Product Safety Commission*, 447 U.S. at 117, 100 S.Ct. at 2060 (quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)).

A thorough review of Congress's statements regarding Title X, and its treatment of proposed amendments over the past eighteen years, fails to sustain plaintiffs' assertions.

Title X's initial authorization for appropriations ran through fiscal year 1973. In that year, Congress passed the Health Programs Extension Act of 1973, Pub.L. No. 93–45, 87 Stat. 93, which extended Title X's funding for another fiscal year. Discussion of Title X was limited to one paragraph, concerning only the levels of current and proposed funding. *See* H.Rep. No. 93–227, 1973 Code Cong. & Admin. News 1464, 1472 (1973).

By a vote of 247 to 123, the House defeated the following proposed amendment to Title X's appropriation for fiscal year 1974:

No part of the funds appropriated under this Act shall be used in any manner directly or indirectly to pay for abortions or abortion referral services, abortifa-

cient drugs or devices, the promotion or encouraging of abortion, or the support of research designed to develop methods of abortion, or to force any State, school or school district or any other recipient of Federal funds to provide abortions or health or disability insurance abortion benefits. 120 Cong.Rec. 21,687–95 (1974) The debate on this amendment sheds no light on the issues presented by the new regulations.

The Family Planning Services and Population Research Act of 1975, Pub.L. No. 94–63, 89 Stat. 304 authorized appropriations for Title X through fiscal year 1977. The House, with virtually no debate and no recorded vote, rejected an amendment to the appropriations bill forbidding Title X grantees to "pay for abortions, or to promote or encourage abortions." 121 Cong. Rec. 20,863–64 (1975) The Senate Report stated that Title X's intent "was to greatly expand the availability of voluntary planning services with priority on low-income individuals." 1975 Code Cong. & Admin. News 469, 515. It explained that Title X programs offer both medical and social services including counseling, and stated the Committee on Labor and Public Welfare's belief "that provision of contraceptive services should be preceded by counseling about the consequences and significance of a decision to use contraceptives." Id. at 517. The Report also defined the requirement of informed consent to include:

(1) a fair explanation of the procedures to be followed, including an identification of any which are experimental; (2) a description of any attendant discomforts and risks reasonably to be expected; (3) a fair explanation of the likely results should the procedure fail; (4) a description of any benefits reasonably to be expected; (5) a disclosure of any appropriate alternative methods or procedures that might be advantageous; (6) an offer to answer any inquiries concerning the procedures; and (7) an instruction that the subject is free either to decline entrance into a project or to withdraw his or her consent and to discontinue participation in the project or activity at any time without prejudicing future care. *Id.* at 524–25.

The Committee, although "generally impressed that [Title X] has worked very well," believed several sections "need[ed] strengthening and clarification." *Id.* at 521. Section 1008 was not among them.

In 1977, the Health Services Extension Act of 1977, Pub.L. No. 95–83, 91 Stat. 389, extended Title X's funding through fiscal year 1978.

When debate was held on Title X's reauthorization in 1978, Representative Dornan proposed the following amendment:

No grant or contract authorized by this Title may be made or entered into with an entity which directly or indirectly provides abortion, abortion counseling, or abortion referral services. 124 Cong. Rec. 37045 (1978)

The sponsor of the reauthorization, Representative Rogers, argued that it was not necessary in light of section 1008's prohibition. The amendment was defeated.

The Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357, *reprinted in* 1981 Code Cong. & Admin. News 396, 888, extended Title X's funding through 1984, and stated that Title X's services "include medical examinations, counseling, pregnancy tests, information and education activities, and birth control and infertility services."

The House Energy and Commerce Committee Report on the Extension of Title X in 1985 contained the following:

Title X has included a prohibition on the use of family planning funds for abortion since its enactment in 1970. The Committee ... is satisfied that Title X grantees are complying with this prohibition. Indeed, in 1984, Secretary Heckler testified before the Subcommittee on Health and the Environment that Title X's grantees 'have been very aware and have honored the law in terms of the abortion prohibition....' The Committee, therefore, has overwhelmingly rejected proposed amendments that would affect the interpretation and implementation of this section and has chosen instead to re-affirm the language of the 1970 Confer-

ence Report, H. Rept. No. 91–1667 accompanying the original Title X legislation:

> The Conferees have adopted the language in Section 1008, which prohibits the use of [Title X] funds for abortion, in order to make clear this intent. The legislation does not and is not intended to interfere with or limit programs conducted in accordance with State or local laws and regulations which are supported by funds other than those under this legislation.

The Committee has renewed this prohibition in the belief that it is adequate. The Committee does not intend—and would discourage—regulatory efforts to modify restrictions that the Committee has chosen to retain. Previous efforts to create restrictions beyond the original intent of the law have been unnecessary and without statutory foundation. H.R.Rep. No. 99–159, June 4, 1985, 6–7.

In 1985, Congress extended Title X's funding by continuing resolution. The House Report approved HHS's 1981 guidelines which provide for "non-directive" counseling. (see below) H.R.Rep. No. 403, 99th Cong., 1st Sess. 6 (1985). Since 1985 funding for Title X has been provided for by continuing resolution.

Thus, despite the interpretation of specific statements urged by the parties to support their views, it appears that no explicit guidance, or even illumination, is supplied by the legislature's subsequent treatment of Title X, at least as far as the issues in this case are concerned.

### D. *HHS Interpretations since 1970*

■ "In addition to the importance of legislative history, a court may accord great weight to the longstanding interpretation placed on a statute by an agency charged with its administration. This is especially so where Congress has reenacted the statute without pertinent change." *National Labor Relations Board*, 416 U.S.

at 275, 94 S.Ct. at 1762. *Accord Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("agency's interpretation of a statute may be confirmed or ratified by subsequent congressional failure to change that interpretation") An agency, however, is not required to "establish rules of conduct to last forever." *Motor Vehicle*, 463 U.S. at 42, 103 S.Ct. at 2866.

### 1. Counseling and Referral Prohibition

Plaintiffs assert that HHS has "long interpreted the statute to allow Title X clinics to provide non-directive, unbiased counseling regarding the options available to pregnant women, including abortion, and when appropriate, to refer clients to abortion providers." (Rust Memorandum, p. 4)

A series of memoranda and letters [6] written by HHS [7] staff counsel during the 1970's discuss, and approve, non-directive counseling. See, *e.g.*, November 19, 1976 letter from Louise Hellman, Deputy Assistant Secretary for Population Affairs to Hilary Conner, Regional Health Administrator ("[Y]ou should not employ directive counseling in relation to abortions. A counselor working under the aegis of a physician, however, has not only a First Amendment right but duty to inform a patient of all legal options."); Memorandum of April 14, 1978 from HHS Senior Attorney Carol Conrad to Elsie Sullivan, Bureau of Community Health Services ("the provision of information concerning abortion services [and] mere referral of an individual to another provider of services for an abortion" is not prohibited); May 25, 1979 Memorandum from Louis Belmonte, Regional Program Consultant ("The provision of information on abortion services and the mere referral of a patient to another provider for such a procedure are permissible"); Memorandum of July 25, 1979 from Carol Conrad to Elsie Sullivan ("Sec-

---

**6.** All appear in Plaintiffs' Joint Appendix to Memorandum of Law.

**7.** Before 1981, HHS was the Department of Health, Education and Welfare ("HEW"). All references to HHS in this opinion include, where applicable, HEW.

tion 59.5(d) requires referral to a provider who might recommend or provide an abortion because of the patient's medical condition or the condition of the fetus ... where such a referral is necessary because of medical indications, abortion is not being considered as a method of family planning at all, but rather as a medical treatment ...").[8]

Further, the current [1981] HHS Program Guidelines For Project Grants For Family Planning Services (the "guidelines") provide:

Pregnant women should be offered information and counseling regarding their pregnancies. Those requesting information on options for the management of an unintended pregnancy are to be given non-directive counseling on the following alternative courses of action, and referral upon request:

· Prenatal care and delivery
· Infant care, foster care, or adoption
· Pregnancy termination

In short, HHS has significantly changed its longstanding interpretation of section 1008 with respect to referrals for abortion. Acknowledging this change, the Secretary justifies the new regulations as bringing Title X practices "into conformity with the language of the statute":

Because counseling and referral activities are integral parts of the provision of any method of family planning, to interpret section 1008 as applicable only to the performance of abortion would be inconsistent with the broad prohibition against use of abortion as a method of family planning. 53 Fed.Reg. at 2923.

The Secretary argues that:

Even if the abortion counseling and referral provided for by the current guidelines were not prohibited by the express language of section 1008 ... [they] fail to offer 'clear and operational' guidance to grantees about how to preserve the

distinction between Title X programs and abortion as a method of family planning. *Id.*

The Secretary's first assertion is tantamount to contending that section 1008 is only capable of one interpretation. As stated above, section 1008 does not speak to these issues unambiguously. However, that does not mean the new regulations do not give it a permissible construction.

The assertion that Title X grantees lack guidance rests upon comments received from Title X grantees in response to the Secretary's proposed rules, 52 Fed.Reg. 33210 (Sept. 1, 1987), and reports written in 1982 by the General Accounting Office (GAO) and HHS's Office of the Inspector General. The GAO Report recommended that "the Secretary establish clear operational guidance by incorporating into the Title X program regulations and guidelines, HHS's position on the scope of the abortion restriction in section 1008." (Defendant's Memorandum, p. 16 (quoting GAO Report)) On the other hand, former HHS Secretary Heckler testified before the House Subcommittee on Health and the Environment in 1984 that "Title X grantees have been very aware and have honored the law in terms of the prohibition," H.R.Rep. No. 99-159, June 4, 1985. The present Secretary's disagreement with the conclusion reached by his predecessor, and his determination that HHS's current reading of section 1008 should be made clear, do not render the new regulations arbitrary or capricious. *Motor Vehicle*, 463 U.S. at 41, 103 S.Ct. at 2865.

## 2. Prohibition of Encouraging, Promoting or Advocating Abortion

HHS has consistently stated that Title X funds are not to be used to encourage, promote or advocate abortion. See, *e.g.*, Letter of November 19, 1976 from Louise Hellman to Hilary Conner ("if you are funded under Title X you cannot promote

---

8. See also Memorandum of the Secretary of HHS as *amicus curiae* in *Valley Family Planning, et al. v. State of North Dakota,* 80-1471 (8th Cir.1979) (Section 59.5(d) "includes a requirement for abortion referral services ... In such circumstances [necessity or medically indi-

cated], the Title X project could not, consistent with 42 CFR 59.5(d), refuse to refer the woman to another provider who would provide an abortion if in his or her own judgment it was medically indicated.")

or encourage abortion"); Memorandum of April 14, 1978 from Carol Conrad to Elsie Sullivan (Section 1008 "prohibits activities which promote or encourage the use of abortion as a method of family planning ... in the sense of encouraging persons to obtain abortions and the provision of transportation to persons to enable them to obtain abortions"); Memorandum of July 25, 1979 from Carol Conrad to Elsie Sullivan (a project may "make 'mere referrals' for abortion, so long as it does not then go on to promote or encourage use of the procedure for family planning purposes"). The Secretary points out that § 59.10 represents the "longstanding interpretation of section 1008 by this Department, of which the grantee community should be aware and is [sic] currently bound." 53 Fed.Reg. at 2942.

Only the restriction on "[p]aying dues to any group that as a significant part of its activities advocates abortion as a method of family planning", § 59.10(a)(3), differs from HHS's earlier view as stated in the May 25, 1979 memorandum from Louis Belmonte ("participation in a national organization as a dues paying member, does not imply sufficient commitment to the federation's abortion activities, and thus it's allowable under Section 1008.") However, this minor departure from HHS's longstanding, general restrictions on lobbying and advocacy is not beyond the scope of the Secretary's broad discretion.

### 3. Separation Requirement

Some years after Title X's passage, HHS stated that "where a Title X grantee also conducts other activities which are not part of the grant-supported program and would not be permissible under the statute, ... the grantee must ensure that the Title X-supported program is separate and is distinguishable from those other activities.

Separate bookkeeping entries are not enough." (Memorandum of April 14, 1978 from Carol Conrad to Elsie Sullivan). But, "a hospital offering abortions for family planning purposes, consonant with state law" would not be barred from receiving Title X funds "for the operation of a separate family planning program which utilized only preventive family planning methods." (Memorandum of April 30, 1972 from Joel M. Mangel to Louis Hellman). Perhaps the clearest indication that HHS traditionally has not required Title X projects to be fully separate from facilities performing abortions or abortion-related services is the obvious: most Title X projects do share personnel and physical facilities with abortion clinics.

The new separation requirement, by requiring separate facilities and personnel, goes much further than prior HHS policy and imposes significant changes on Title X projects:

> Clinics with comprehensive reproductive health services and even large metropolitan hospitals cannot provide for the degree of separation called for by § 59.9. Many, if not most of such facilities have deliberately attempted to integrate services which are substantively related in the interest of efficiency and the overall convenience of staff and patients.... toward compliance with Title X's requirement of coordinated services and the maximization of limited financial resources.

> [Separate medical records mean that] the health professional in a Title X-funded program will routinely be forced to reach decisions regarding the provision of family planning treatment based on what may be an incomplete medical history. Declaration of Raymond Fink, Chairperson of MHRA.[9]

9. *See also* Declaration of Francine Stein, Executive Director of PPW/R (detailing the expenses of new facilities and the time required to obtain operating certificates); Declaration of Dr. Irving Rust (explaining that the "proximity of services and personnel" enables Title X program to counsel immediately post abortion patients "to encourage a responsible attitude toward sex and reproductive health"); Declaration of Lorraine

Tiezzi, Director of family planning clinics at Presbyterian Hospital (although "[a]bortions are performed at Presbyterian Hospital on a separate floor", the "family planning clinic and abortion services are both part of the OB–GYN clinic, and thus share the same entrance, and waiting and reception areas" as well as patient records); Declaration of Marilyn Bennett, Executive Director of Hudson Health ("our family

Nonetheless, the Secretary argues that unless separate facilities are maintained, Title X funds would in effect be subsidizing the performance of abortions and abortion-related activities. This determination, in light of section 1008's prohibition on using Title X funds in "programs where abortion is a method of family planning," is a permissible construction of the statute.

The foregoing review supports only the conclusions that (1) the new regulations do not offend the direction contained in section 1008; (2) nothing in the contemporaneous or subsequent legislative treatment of Title X shows with such clarity that the new regulations violate the legislative intent that they should be set aside; and (3) the new regulations, despite their significant changes from the guidelines, are supported by sufficiently reasonable grounds that they should not be set aside as arbitrary or capricious.

Accordingly, one must now turn to plaintiffs' claims that the regulations are unconstitutional.

II.  Constitutional Claims

A.  *Counseling and Referral Prohibition; Prohibition of Encouraging, Advocating, or Lobbying of Abortion*

■ Both the federal and state governments may "make a value judgment favoring childbirth over abortion, and ... implement that judgment by the allocation of public funds." *Maher v. Roe,* 432 U.S. 464, 474, 97 S.Ct. 2376, 2382, 53 L.Ed.2d 484 (1977). As stated in *Harris v. McRae,* 448 U.S. 297, 314, 100 S.Ct. 2671, 2686, 65 L.Ed. 2d 784 (1980):

> The doctrine of *Roe v. Wade,* the Court held in *Maher,* "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy," *id.* [432 U.S.] at 473–474, 97 S.Ct. at 2382, such as the severe criminal sanctions at issue in *Roe v. Wade, supra,* or the absolute requirement of spousal consent for an abortion

challenged in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 [1976].

But the constitutional freedom recognized in *Wade* and its progeny, the *Maher* Court explained, did not prevent Connecticut from making "a value judgment favoring childbirth over abortion, and ... implement[ing] that judgment by the allocation of public funds." 432 U.S., at 474, 97 S.Ct., at 2382. As the Court elaborated:

> "The Connecticut regulation before us is different in kind from the laws invalidated in our previous abortion decisions. The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantages as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the services she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation." *Ibid.*

In sum:

> There is a basic difference between direct state interference with a protected activity and state encouragement of an alternate activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader. *Maher v. Roe,* 432 U.S. at 475–76, 97 S.Ct. at 2383 (footnote omitted).

Here the question is whether the regulations interfere with constitutionally protect-

---

planning program would have to be physically separated from our maternal/infant program in which the option of abortion is often discussed

following genetic counseling and amniocentesis").

ed rights (claimed to be the Title X health providers' First Amendment right to counsel their patients and their patients' First and Fifth Amendment rights to receive information about abortion services) or simply allocate financial support to those who do not counsel about abortion but encourage childbirth.

Both *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) and *Lyng v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America*, —— U.S. ——, 108 S.Ct. 1184, 1190, 99 L.Ed.2d 380 (1988) "reject the notion that First Amendment rights are somehow not fully realized unless they are subsidized ..." The Court cautioned, however, that "[t]he case would be different if Congress were to discriminate invidiously in such a way as to 'aim at the suppression of dangerous ideas.'" *Taxation With Representation*, 461 U.S. at 548, 103 S.Ct. at 2002. Plaintiffs argue that by requiring Title X grantees to supply pregnant clients with a list of prenatal care providers and forbidding them to counsel about abortion services, the new regulations are "selective prohibitions about what may be said [which] may not be viewed as a mere refusal to subsidize the exercise of rights." (Plaintiffs' Joint Response to Defendant's Second Notice of Recent Decision, p. 3)

The regulations reflect the Secretary's decision to favor childbirth over abortion and section 1008's requirement that no Title X funds be used in programs where abortion is a method of family planning. Counseling women who seek family planning assistance, and who are not yet pregnant, about abortion treats abortion as a method of family planning. Congress has already forbidden funding for that purpose, a choice which can hardly be argued to have "interfered" with free speech.

■ More troubling is the Secretary's requirement that pregnant women be given a list, which may be biased in favor of providers of prenatal care, in response to their queries about abortion services. If that requirement were imposed upon all health care providers (whether or not supported by government funds) by law, or if any providers were penalized for speaking of abortions, that would constitute invidious discrimination of ideas. *Cf. Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). But here, the regulation simply defines who may, and who may not, receive Title X funds. The condition that federal funds will be given only to those who support particular views does not violate constitutional rights. *See, e.g., Taxation With Representation*, 461 U.S. at 548, 103 S.Ct. at 2002 ("Congress could, for example, grant funds to an organization dedicated to combating teenage drug abuse but condition the grant by providing that none of the money received from Congress should be used to lobby state legislatures.")

*FCC v. League of Women Voters of California*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), on which plaintiffs rely, does not compel a different result. Striking a provision of the Public Broadcasting Act of 1967 forbidding any noncommercial educational radio or television station which receives grants from "engaging in editorializing," the Court stated:

> We do not hold that the Congress or the FCC is without power to regulate content, timing, or character of speech by noncommercial educational broadcasting stations. Rather, we hold only that the specific interests sought to be advanced by [the] ban on editorializing are either not sufficiently substantial or are not served in a sufficiently limited manner to justify the substantial abridgment of important journalistic freedoms which the First Amendment jealously protects. *Id.* at 403, 104 S.Ct. at 3129.

Thus, even where the First Amendment freedoms of a broadcasting medium whose sole purposes are the dissemination of ideas and public discussion of issues are at stake, neither Congress nor an agency is entirely "without power to regulate" content, timing, and character of speech.

The point here, however, is that HHS's regulations, which merely withhold grants of federal funds from those who wish to

counsel women about abortion, refer them to abortion providers, or advocate, encourage or promote abortion in other ways, do not violate the rights of either such persons or their patients. The regulations do not prohibit or compel speech. They grant money to support one view and not another; but that is quite different from infringing on free speech.

### B. *Separation Requirement*

■ The Secretary argues that the new regulations are "constitutional under the standards set forth in *Regan v. Taxation Without (sic) Representation, supra* and *League of Women Voters, supra,* because they do not prohibit organizations from establishing affiliates that provide abortion materials." 53 Fed.Reg. at 2942–43.

In *Taxation With Representation* the Court rejected a First Amendment challenge to an Internal Revenue Code section which prohibits use of tax-deductible contributions for lobbying. The Court noted that the organization could set up two groups: one to engage in lobbying, and another eligible for tax-deductible contributions for its nonlobbying activity. *Id.* 461 U.S. at 544, 103 S.Ct. at 2000. The Court held that the IRS requirement "that the two groups [the lobbying division and the non-lobbying division] be separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying.... is not unduly burdensome." *Id.* at 544 n. 6, 103 S.Ct. at 2000 n. 6.

Maintaining separate signs, forms of identification, and accounting records, as in *Taxation With Representation,* does not impose unduly burdensome restrictions on Title X grantees. The requirements of separate personnel and facilities go considerably further than the separation requirements at issue in *Taxation With Representation* or those suggested in *League of Women Voters.* However, the Secretary's view that these regulations are necessary to assure compliance with the other regulations is not unreasonable. Although the regulations do impose a burden upon Title X programs, the burden is not so excessive as to infringe plaintiffs' constitutional rights.

Nor do the regulations infringe upon the grantees' rights to exercise free speech in programs supported by funds from other sources. The Secretary declines to contribute funds to programs counseling about abortion. Title X grantees are free to engage in such programs, supported by funds from others, as long as those programs are kept separate from their Title X activities. That arrangement is valid. See *League of Women Voters,* 468 U.S. at 400, 104 S.Ct. at 3128:

> Of course, if Congress were to adopt a revised version of § 399 that permitted noncommercial educational broadcasting stations to establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid under the reasoning of *Taxation With Representation.*

### CONCLUSION

Plaintiffs' motion for summary judgment is denied, and defendant's motion for summary judgment is granted.

The Clerk will enter judgment dismissing the complaints, together with costs and disbursements as provided by law.